H. JOLSEN'S TAENDSTIKF ABRIKKER ENEBAK AND BRYN, Respondents, *v.* HORACE K. THURBER *et al.*, Appellants.

*Court of Appeals, February* 25, 1890.

Reversing 45 Hun, 589, Mem.

1. *Contract. What necessary to constitute.*—In order to constitute a contract, there must be a concurrence of the minds of all the parties to the thing to be done, and unless all parties consent, there can be no contract.
2. *Same.*—Facts held not to constitute a contract for want of mutuality.

Appeal from a judgment of the general term of the supreme court, affirming a judgment entered upon a verdict.

*E. More,* for appellants.

*August Reymert,* for respondents.

BROWN, J.—The complaint alleged that on or about the 19th or 20th days of November, 1883, the plaintiff, a corporation located and engaged in the manufacture of matches in Norway, received an order from the defendants to ship and deliver to them 200 cases of matches, and all such additional quantities of matches as the plaintiff could manufacture and ship in the course of eight months following the date of said order. That the plaintiff accepted said order and proceeded to carry out the same. That the shipments were to take place from time to time during such a period as might be convenient to plaintiff on the Wilson line of steamers, who were the agreed carriers of said matches.

It further alleged willingness and readiness on plaintiff's part to carry out its part of said contract and tender from time to time to defendants of 3,000 cases of matches, and refusal on defendants' part to accept said matches or any part of them, and failure to carry out or fulfil the contract on their part.

It alleged that plaintiff had sustained damages by the acts of defendants to the amount of $7,260, for which sum judgment was demanded. The answer, among other things, denied the giving of any order and the making of any contract such as was set forth in the complaint.

The principal question litigated on the trial was whether any valid contract existed between the parties, and at the close of the evidence the court was asked by the counsel for defendant to dismiss the complaint on the ground " that no contract by defendants to take all the plaintiff could ship for eight months was proven."

The court refused so to hold, and submitted the question to the jury for them to decide whether the evidence established a contract, and the question presented on this appeal is whether the evidence permitted the inference, by the jury, that such a contract as alleged existed.

After a careful examination of the evidence we are of the opinion that it does not establish a contract, and that the court erred in not granting the motion to dismiss the complaint.

The plaintiff was a corporation engaged in the manufacture of matches in Norway, and the defendants were merchants and importers engaged in business in the city of New York. One Mr. Charles P. Thore appears as the defendant's agent in some of the transactions to which reference will be made.

The first communication between the parties bearing upon the question at issue was a letter addressed by the plaintiff to Mr. Thore at Copenhagen, under date of June 7, 1883.

So much of this letter as is of importance is as follows : " According to our conversation during your last stay here, I by the present have to inform you that I may be able to offer your firm in New York, Messrs. H. K. & F. B. Thurber & Co., three to four thousand cases matches from H. Jolsen's factories, to be shipped during the year by about 300 cases monthly."

Samples of the matches were soon after sent to the defendants at New York. Subsequent to this date business relations of a limited character appear to have been established between the parties, the defendants ordering matches by telegram as they desired them, and a code was established between the parties to facilitate ordering by cable.

On October 24th, the defendants wrote to the plaintiff explaining to them the custom duties, and in what manner matches must be ordered and shipped in order that they could be imported at the lowest expense possible.

They also asked a quotation of prices for their goods and gave it the form of an invoice for shipping purposes. On the 16th of November the plaintiff replied to the inquiry as to prices. Up to this date, all shipments by the plaintiff had been made by the Thingvalla line of steamers. A fire had broken out on one of these steamers which, it appears from the evidence, had been attributed to the matches, and for this and other reasons no further shipments could be made by this line.

On November 19th the defendants cabled to the plaintiff as follows : " Gagged, made firm immediate contract Wilson line, all you can ship eight months." The word " Gagged " meant in the code established between the parties 200 cases of matches of the brand known as " Bear."

This dispatch was followed by a letter under the same date, the material parts of which are as follows : " To-day we send you the following dispatch. " Gagged, made firm immediate contract Wilson's line all you can ship eight months," by which is to be understood that we order from you 200 50 gross cases Bear matches. By telegram from Copenhagen we are informed that shipment of matches by the Thingvalla line ceases and we therefore hope that you immediately on receipt of our telegram make firm contract with the " Wilson Line " Company for shipment to us of your matches.

" The agents for " Wilson Line " here refuse to make up

contract for matches and we hope that you may have better success in making up contract in Christiania."

November 28th plaintiff cabled " Wilson freight 27–6 conditionally. Leave me arrange best possible. Wire." Defendants replied " Arrange best possible."

December 1st plaintiff wrote acknowledging receipt of cablegram of November 19th and stating that a contract had been made with the Wilson line of which a copy was enclosed. It, also, enclosed a proposed contract acknowledging the sale by plaintiff to defendant of three or four thousand cases of matches at prices specified in letter of November 16th, to be shipped as plaintiffs were ready, on order from defendants, on Wilson line of steamers according to terms stated in proposed freight contract.

It further enclosed power of attorney to defendants to register in the proper office at Washington seven trade marks, pursuant to a request by defendants contained in their letter of October 24. On December 7th the plaintiff wrote again, acknowledging receipt of the defendant's letter of November 19th and referring to its letter of December 1st for answer thereto.

The proposed contract enclosed in the letter of December 1st was never signed by defendants, nor returned so far as we are informed by the record before us. On December 21st plaintiff cabled " What wanted after Gagged." To which no reply was made, and on January 18, 1884, defendants wrote, acknowledging receipt of the letter of November 16th and December 1st with enclosure, and saying " Our Mr. Thore left for Europe on the 16th inst., and will shortly call on you when all pending matters can be arranged by him in person."

Nothing further passed between the parties except a letter by plaintiff under date of March 3rd, complaining of the failure to receive order, and that Mr. Thore had not arrived. On April 21st Mr. Thore reached Christiania, and the substance of his interview is embodied in a letter to plaint-

iff's agent of that date. Beyond explaining the tariff duties on matches as construed under a then recent decision of the attorney-general and stating that by reason of the increase of those duties over those paid prior to such decision it was not profitable to defendants to import matches, and, therefore, shipments must stop, it contained nothing material to the question under discussion,

I have now referred substantially to all the corespondence that passed between the parties bearing upon the question at issue. The paper chiefly relied upon by plaintiff as creating a binding obligation on defendants' part to purchase all the matches that plaintiff could manufacture and ship for eight months, is the telegram of November 19th.

We are of the opinion that this telegram will not bear the construction given it. Leaving out of consideration the word "Gagged," which had a definite meaning given to it by the agreement of the parties, the remainder of the dispatch refers entirely to the shipping contract with the Wilson line of steamers. Nothing is said that indicates that it was the intention of defendants that thereafter their relations with plaintiff should be any different from what they were prior to sending the dispatch. The letter of the same date which followed fully explained the meaning of the dispatch and gave the reason for defendants' desire to make the shipping contract. The Thingvalla line had refused to carry the matches any longer, and the agent for the Wilson line at New York refused to make a contract, and hence the letter states "we therefore hope that you immediately on receipt of our telegram make firm contract with the Wilson line for shipment to us of your matches. The agent here refuses to make up contract for matches, and we hope that you may have better success in making up contract in Christiania."

Not a single word or expression is contained in the letter on the subject of a contract with plaintiff. This language seems too plain to admit of doubt.

The plaintiff appears to have inferred that as defendants were willing to bind themselves to the steamship company, that, therefore, they intended to bind themselves to the plaintiff to take the product of its factory during the period of the shipping contract. But this by no means follows. A special reason existed for the making of the shipping contract growing out of the fire on the Thingvalla line steamer, and the refusal of that company longer to carry the matches. A certain and sure means of transit was necessary to the business of importing the matches, and the defendants may have been entirely willing to assume the obligation to the steamship line and pay dead freight, if necessary, to secure sure carriage of the matches when ordered, and yet, owing to the uncertain construction of the tariff laws, been unwilling to bind themselves to the purchase of matches for a long period of time, when the result might be that the goods could be imported only at a loss.

And this we think is what they did do. The telegram directed the plaintiff's agent to make the contract with the Wilson line in behalf of the defendants, and the agent so understood it, and that neither he or the plaintiff was to assume a personal liability thereon. At the time of sending the dispatch the tariff had been interpreted in two different ways by the secretary of the treasury, and he had finally referred the question to the attorney-general. The defendants were aware, therefore, that if the interpretation of that law adverse to their construction was adopted, they could import the matches only at a loss, and as plaintiff was willing to sell its matches and had been doing so for several months, no reason is apparent why defendants should desire to make a contract that might prove to be unprofitable to them. Moreover, at the date of the dispatch defendants had not received the quotation of price asked for by the letter of October 24th, and the telegram could not have been regarded as accepting the offer contained in that letter. Such prices were not sent from Christiania until November 16th,

three days before the sending of the telegram. Acknowl-edgment of the receipt of the letter was made by defendants in their letter of January 18th, in connection with the state-ment that Mr. Thore had sailed for Europe and would call on plaintiff, " when all pending matters could be arranged by him in person." The only matter then pending was the subject of the purchase of the matches.

Reading the telegram and the letter of November 19th, in the light of the surrounding circumstances which were known to both parties, we do not think they can be con-strued as intending or meaning anything more than a direc-tion to plaintiff's agent to make a contract with the steam-ship line. The letter of January 18th certainly shows that up to that time defendants had not intentionally made an agreement. They had not signed the proposed contract sent them, and the matter was referred to Mr. Thore to be arranged by him in person.

It is hardly necessary to add that no construction that plaintiff gave to the dispatch and letter of November 19th, and nothing that it did in reliance thereon, could create a con-tract between the parties. A contract imports mutuality and there must be the concurrence of the minds of all parties in reference to the thing to be done, and there can be no contract unless all parties assent.

We are unable to find in the telegram and letter of Novem-ber 19th the expression of any intention on the defendants' part to take the product of the plaintiff's factory during the term of the shipping contract.

We are of opinion, therefore, that the complaint should have been dismissed.

The judgment must be reversed, and a new trial granted, with costs to abide event.

All concur; POTTER and BRADLEY, JJ., in result.

POTTER and BRADLEY, JJ., concur in granting a new trial on the ground that it was error for the court to instruct

the jury that if plaintiff was led to believe by the dispatch of November 19th that the defendants desired plaintiff to ship all the matches which it could manufacture during the period of eight months and acted upon it in good faith, that it had established a right of action against defendants. That such error was in making the effect of the dispatch upon the defendant's liability dependent solely upon the belief which it induced the plaintiff to entertain in respect to its purpose.